**SO ORDERED: March 20, 2017.**



_____
**Robyn L. Moberly
United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| BREATH OF LIFE HOME MEDICAL EQUIPMENT AND RESPIRATORY SERVICES, INC. | ) ) ) | CASE NO. 16-1930-RLM-7A |
| | ) | |
| Debtor | ) | |
| _____ | ) | |
| | ) | |
| JOANNE B. FRIEDMEYER, Trustee | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| Vs. | ) ) | Adversary Proceeding No. 16-50282 |
| BREATH OF LIFE O2, LLC, AGS CAPITAL, LLC, JOHN P. NAUYOKAS, TERRI L. SYMONS and ALAN G. SYMONS | ) ) ) ) ) | |
| | ) | |
| Defendants | ) | |
| _____ | ) | |

**ORDER on MOTION TO DISMISS FILED BY DEFENDANTS AGS CAPITAL, LLC, TERRI L. SYMONS AND ALAN G. SYMONS**

1

This matter came before the Court on February 9, 2017 for hearing upon the motion filed by defendants AGS Capital, LLC, Terri Symons and Alan Symons to dismiss certain counts of the Plaintiff's complaint under Fed. R. Civ. P. 12(b)(1) and (6), applicable to this adversary proceeding by Fed. R. Bankr. P. 7012.  Defendant Breath of Life 02, LLC has joined in the motion.

### *Allegations of the Complaint*

The debtor, Breath of Life Home Medical Equipment and Respiratory Services, ("BOL") was in the business of providing home health equipment and respiratory services.  It was incorporated in 2008 and its shareholders originally consisted of four members of the Fish family.  John Nauyokas ("Nauyokas") was president of BOL.

AGS Capital, LLC ("AGS") is an Indiana limited liability corporation and is in the business of investing in companies through direct equity investment or through lending. Alan Symons ("Alan), his wife, Terri Symons ("Terri") and his brother Doug Symons controlled AGS.

Nauyokas approached AGS in 2011 about purchasing the Fishes' stock.  AGS apparently responded favorably and AGS, through its officers, formed Breath of Life 02, LLC ("02").  The purpose of forming 02 was to use it as the vehicle to acquire BOL's assets.  However, this plan was shelved when it was decided an asset purchase had unfavorable tax ramifications to 02 and it was more advantageous for individuals, and not 02, to purchase the stock.  To that end, the Fishes agreed to sell their BOL stock to Nauyokas, Terri and two other individuals (the "Buyers") for $350,000.

BOL, not the Buyers, borrowed $350,000 from AGS to fund the $350,000 stock purchase (the "2011 Loan").  The 2011 loan from AGS to BOL was documented and was secured by virtually all of BOL's assets.  Once BOL had the proceeds of the loan, stock was transferred to the new shareholders.  Terri received 60% of the shares of BOL and Nauyokas received 36%of the shares.  Nauyokas eventually acquired the remaining 4% of shares from the other two shareholders, giving him a 40% stake in BOL.  He later transferred half of his interest to Terri, resulting in her having an 80% stock ownership in BOL by summer, 2014.  No shareholder paid any money to the

2

Fishes or to BOL for their BOL stock. AGS did not perfect its security interest in the collateral pledged for the 2011 Loan until September, 2015, within a year of BOL's chapter 7 filing.

After the stock purchase, Nauyokas continued as BOL president and Alan allegedly became the CEO and participated in BOL's day to day decision making and operations. Most of BOL's business consisted of leasing medical equipment from third party vendors and, in turn leasing this equipment to its end-user customers. In 2012, Alan negotiated on BOL's behalf with Star Financial Bank to obtain a $500,000 line of credit (the "Star Loan"). Without Nauyokas' prior knowledge, AGS caused $350,000 of the Star Loan to be used to repay the 2011 Loan back to AGS, the company owned by Alan, Terri and Alan's brother, Doug. AGS purchased the Star Loan after BOL filed its chapter 7 bankruptcy case.

By 2014, BOL's financial health had deteriorated and major third party vendors from whom BOL leased its medical equipment threatened collection actions. Alan, along with an AGS employee, Keith Siergiej, and Steve Blackburn, whose affiliation is not alleged in the Complaint, attempted to negotiate reduced payouts to third party vendors but they were unsuccessful. BOL identified this high operational cost of leasing its medical equipment as a "fatal flaw" in its business plan. It concluded that the flaw could be corrected if it purchased the medical equipment outright and continued to lease it to its end users. Rather than loan money to BOL, AGS loaned money to 02 to purchase equipment which 02 in turn leased to BOL. Such an arrangement did nothing to correct the "fatal flaw" in BOL's business plan. Although 02 's only business purportedly consisted of leasing medical equipment to BOL, 02 began operating out of the same space as BOL, obtained provider numbers needed to receive payment directly from health insurance companies, and developed a logo and letterhead for 02 by spring 2014. BOL's controller negotiated 02's purchase of inventory.

In December 2015, a creditor of BOL garnished BOL's bank account, causing BOL to default on its payroll obligations. AGS transferred $25,000, not to BOL, but to 02. 02 used those funds to pay BOL's payroll. In exchange for that payment, BOL executed a letter of intent on December 15, 2015 wherein it agreed to transfer to 02 two of its vans, all computer equipment and software licenses, phone equipment, furniture

3

and other property. Most importantly, the services BOL provided to its end-users/patients would be 02's property and all payments BOL received from such services were to be deposited into 02's account. 02 acquired the right to collect BOL's receivables for a year. The transfer of BOL's assets to 02 was not documented. Nauyokas signed the letter of intent as CEO of BOL. After the letter of intent was executed, Nauyokas continued to act as president of 02, and 02 assumed responsibility for BOL's payroll, employee benefits and operating expenses. 02 also serviced all of BOL's patients using BOL's employees, equipment and inventory.

As of December 31, 2015, BOL's balance sheet reflected assets of $1,585,000. BOL did not operate its business after the letter of intent was signed. The day after the letter of intent was signed, Alan demanded that Terri's stock be transferred to Nauyokas to "get Terri off of everything". BOL's board of directors consented to the transfer of all of Terri's stock (80%) on December 28, 2015, the same day Terri resigned from BOL's board of directors. The BOL board of directors signed a unanimous written consent detailing the garnishment of BOL's account, the financing of BOL's payroll and the transfer of BOL's future patient services to 02 on December 30, 2015. BOL filed its chapter 7 bankruptcy case on March 18, 2016, a little over 90 days from the date of the December 15th transfer.

*Motions under 12(b)(1) and 12(b)(6)*

A motion to dismiss under 12(b)(6) tests the sufficiency of the complaint. "Notice" pleading under Fed. R. Civ. P. 8(a)(2) requires only that the complaint contain a short and plain statement of the claim showing that the pleader is entitled to relief. Though not a high bar to clear, the complaint nonetheless must include "enough facts to state a claim for relief that is plausible on its face" and must provide "more than labels and conclusions" as "a "formulaic recitation of the elements of a cause of action will not do". *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A complaint is facially plausible if a court can reasonably infer from factual content in the pleading that the defendant is liable for the alleged wrongdoing. *Id.* at 570.

4

A motion to dismiss under Rule 12 (b)(1) for lack of subject matter jurisdiction is a facial attack on a plaintiff's standing. Such facial challenges require only that the court look to the complaint and determine whether the plaintiff has sufficiently alleged a basis of subject matter jurisdiction. *Lardas v. Grcic*, 847 F.3d 561, 565 (7th Cir. 2017), quoting *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). Rule 12(b)(1) motions are reviewed under the same *Twombly* "plausibility" standard used for Rule 12(b)(6) motions. *Lardas* at 565. In reviewing both Rule 12(b)(1) and (6) motions, the court accepts all well-pled allegations as true and draws all reasonable inferences in the plaintiff's favor. *Posley v Clarian Health*, No. 1:11-cv-1511-TWP-MJD, 2012 WL 4101914 at *1 (S. D. Ind. September 17, 2012).

The Trustee's claims against 02 rest upon the theory that 02 has successor liability for the debts of BOL and there was a de facto merger of the two entities. 02 has not argued that Count I against 02 should be dismissed.

AGS, Alan Symons and Terri Symons challenge the Trustee's standing to bring the alter ego and corporate veil piercing claims against them in Counts 2 and 3, and they argue the Complaint fails to state a cause of action against them. Defendants contend the Trustee cannot seek to hold third parties liable for the Debtor's debts but may seek to hold them liable for damages caused to the debtor corporation.

The Trustee's claims against AGS stem from AGS's control over BOL and the claims alleged against Alan and Terri all arise either from their individual liability as officers, shareholders or directors of either BOL or 02, or their derivative liability as persons who controlled AGS. Taking the well pled allegations in the complaint as true and drawing all reasonable inferences in favor of the Trustee, the complaint describes how AGS was not "just" a lender and how it did not have a traditional lending relationship with BOL. Two of the three AGS shareholders (Alan and Terri) became either shareholders or officers of BOL. Alan is alleged to have exerted control over BOL by managing its day to day affairs, directing litigation and searching for sources of financing. BOL became indebted to AGS for $350,000 which was not used for business operations but for the purchase of stock by Alan and Terri. Terri was among the four individuals for whom BOL purchased the stock and was the majority shareholder. Terri paid nothing for her shares. From 2012 through 2015, AGS regularly infused funds into

5

BOL for use in its business operations, but those transactions were not documented. AGS caused 02 to be formed, after it became evident that BOL's creditors would not accept a workout, obtained control over 02, and looted BOL, transferring its assets and its customers to 02. BOL became 02's alter ego as 02 and BOL had common ownership and management. 02 operated the same type of business as BOL, and used an almost identical name, as well and BOL's patient numbers, offices, employees, equipment and inventory.

Seven of the nine counts of the Trustee's complaint are directed at Alan, Terri, AGS, or a combination thereof. Those counts are: Count II (alter ego liability), Count III (piercing the corporate veil), Count V (fraudulent transfer, actual fraud), Count VI (preference avoidance), Count VII (equitable subordination), Count VIII (breach of fiduciary duty) and Count IX (demand for accounting and turnover). Alan, Terri and AGS (referred to as "Movants") have moved to dismiss these seven counts under Fed R. Bankr. P. 7012(b)(1) and (b)(6). 02 is also named as a defendant in four of those seven counts (Counts II, V, VII and IX) and has joined in the Movants' motion to dismiss as to those four counts.

### *Counts II and III: Alter Ego and Piercing the Corporate Veil*
### *(Movants and 02)*

A basic principle of corporate law is that corporate shareholders are liable for acts of the corporation only to the extent of their investment and are not personally liable for the acts of the corporation. Zi*ese & Sons Excavating v. Boyer Construction*, 965 N.E.2d 713, 719 (Ind. Ct. App. 2012). While courts are not keen to disregard the separate corporate identity, the corporate veil will be pierced if it is necessary to prevent fraud or injustice. *Id.* An action to "pierce the corporate veil" disregards the separate corporate identity where the corporation functions as an alter ego or mere instrumentality of an individual or another corporation. *Meridian North Investments LP v. Sondhi*, 26 N.E.3d 1000, 1005 (Ind. Ct. App. 2015). Determination of whether the corporate veil can be pierced is a highly factual inquiry. Factors to be considered include whether: (1) the corporation was undercapitalized, (2) corporate records were kept and corporate formalities were followed (3) corporate assets and affairs were

6

comingled; (4) the corporation paid for individuals' obligations, (5) shareholders or directors made fraudulent representations; (6) the corporation was used to promote fraud, justice or illegal activities, (7) the corporate form was ignored, controlled or manipulated by shareholder acts.  *Aronson v. Price*, 644 N.E.2d 864, 867 (Ind. 1994); *Meridian North* at 1005.

A subset of the corporate veil piercing theory is the corporate alter ego theory whereby two corporations are so closely connected that a plaintiff should be able to sue one for the actions of another because the two corporations essentially are a "single enterprise".  *Ziese*, at 720; *Lock Realty Corp. IX v. U.S. Health, L.P.*, No. 3:05-CV-0715 RM, 2006 WL 3450597 at *3, (N. D. Ind. November 28, 2006).  The factors involved in this inquiry include whether (1) similar corporate names were used, (2) the corporations shared common officers, director and employees, (3) the corporations were located in the same offices and used the same telephone numbers and business cards and (4) the business purposes of the corporations were similar.  *Id.*

The Movants allege that the court does not have jurisdiction over the veil piercing and alter ego counts because those claims are not "general" claims.  A trustee has standing to bring only general claims.  *Koch Refining v. Farmers Union Cent. Exchange, Inc.* 831 F.2d 1339, 1349 (7th Cir. 1987).  A general claim is one where liability on the claim is to all creditors of the corporation and the creditors share a common injury without regard to personal dealings between the wrongdoer and the creditor.  A trustee lacks standing to bring a personal claim where a specific creditor is harmed and no other creditor has an interest in that claim.  *Id.,* 1348-1349.   Indiana law provides that "the alter ego theory is an equitable, remedial doctrine that may be asserted by any creditor without regard to the specific nature of his relationship with the corporation and its alleged alter ego".  *Id* at 1345.  In such cases, a corporate debtor is harmed directly because the wrongdoers have misused the corporate form and the corporate creditors are harmed indirectly because the misconduct has dissipated the pool of assets available to creditors.  An alter ego claim is a general claim which can be brought by a bankruptcy trustee as a representative of all creditors.  *Id.* at 1346.

It is clear from the complaint that the Trustee's alter ego/ veil piercing claims are general claims.  It alleges that AGS, and Alan and Terri, individually and derivatively

7

through their control of AGS, looted BOL and caused it to transfer substantially all of its assets to 02. These actions not only directly harmed BOL by dissipating its assets but also indirectly harmed all of BOL's creditors by diminishing the pool of assets from which their claims could be paid. The Trustee has standing to bring these claims, and the court has jurisdiction to hear and decide them.

The Movants also allege that Counts II and III fail to state a claim under 12(b)(6) because the Trustee has failed to allege that the Movants personally benefitted or received any property from BOL. The Movants cite *Gouveia v. Cahillane*, (*In re Cahillane*), 408 B.R. 175, 204 (Bankr. N.D. Ind. 2009) as authority for this premise. The *Cahillane* case was a fraudulent transfer case under §548 where the debtor transferred funds to a dummy corporation in which his brother was the shareholder. The trustee argued that the debtor's brother was the alter ego of the dummy corporation and that he should be held personally liable as an "initial transferee" under §550(a)(1). The requirement of a benefit or receipt of property discussed in *Cahillane* was in reference to initial transferees under §550(a), but it did not alter the long standing elements of veil piercing which do not require a finding of personal benefit to the defendant. Receipt of and benefit from property may be relevant in the context of who is an initial transferee under §550(a) from which a trustee can recover a fraudulent transfer under §548, but is not needed to state a claim for veil piercing or alter ego.

The allegations taken as true and the reasonable inferences drawn from them show that BOL was undercapitalized, that AGS, Alan and Terri failed to keep records and follow corporate formalities with respect to AGS' dealings with BOL, that BOL paid for Terri's stock, and that BOL was controlled by AGS, which, in turn, was controlled by Alan and Terri. It also sets out sufficient facts to suggest that BOL and 02 were closely connected and operated as a single enterprise. Counts II and III will not be dismissed.

### *Count V: Fraudulent Transfer/ Actual Fraud*
### *(Movants and 02)*

A trustee may avoid a transfer of an interest of the debtor in property made within two years before the date of the filing of the petition under §548(a)(1)(A) if the debtor

voluntarily or involuntarily made such transfer with actual intent to hinder, delay or defraud creditors. The trustee can pursue and recover the property so transferred from the "initial transferee of such transfer or the entity for whose benefit the transfer was made" or "any immediate or mediate transferee of such initial transferee" under §550(a).

The complaint sufficiently states or infers that BOL's property was transferred to 02, and that 02 was the initial transferee. The Movants argue that Count V must be dismissed as to them because the complaint does not designate them as "initial transferees" or "immediate or mediate transferees of an initial transferee" or "one for whose benefit the transfer was made". The "notice" standard under Rule 8 does not require a plaintiff to plead facts matching the elements of the legal theory the plaintiff is suing under. *Hammes v. Striebel*, No. 1:07-cv-1573-WTL-JMS, 2008 WL 5396596 at *2 (S.D. Ind. December 23, 2008).

The Movants also argue that the complaint makes no factual allegations that the Movants received property or benefitted from the transfer. A necessary requirement for "transferee" status under §550(a) is that the transferee have dominion over the property transferred and the right to use the property for his own purposes. *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890, 893 (7th Cir. 1988). The "initial" transferee "is the first entity to have such a dominion or right". *Schechter v. APMC Oil Co., Inc., et. al (In re Hansen),* 341 B.R. 638, 643 (Bankr. N. D. Ill. 2006). Corporate shareholders and directors of a corporation that is the initial transferee are not themselves initial transferees merely by virtue of their shareholder or director status. *Id*., see also, *Cahillane*, at 201. Something more is needed and that something more is proof that the recipient corporation was the shareholder's or director's alter ego:

> The better view- and the one that is consistent with corporate law – is that that shareholders, officers and directors are not liable for transfers to their corporation unless they actually receive distributions of the transferred property (in which case the would be subsequent transferees under Section 550(a)(2), *or a showing can be made to pierce the corporate veil*.

(italics added*)*. *Hansen*, at 646. The Trustee has sufficiently pled facts to state a claim against the Movants for veil piercing and alter ego. Count V will not be dismissed.

9

## *Count VI: Preference Avoidance*
## *(AGS)*

A trustee under §547(b) may avoid a transfer of an interest of the debtor in property if it was made to or for the benefit of a creditor on account of an antecedent debt, made while the debtor was insolvent and made on or within 90 days before the filing of the petition.  The "reach back" period of 90 days from the petition date is extended to one year if the transfer was made to or for the benefit of an "insider".   11 U.S.C. §547(b)(4)(B).  AGS waited to perfect its security interest in collateral that BOL pledged to secure the 2011 Loan until less than a year (but more than 90 days) before BOL filed its chapter 7 case.  AGS first asserts that that BOL was not insolvent when the transfer was made. The complaint passes the plausibility test in that it alleges that the latest BOL reached insolvency was December 9, 2015, a little less than a week before the transfer of assets to 02.  (Complaint, ¶66).  Whether BOL in fact was insolvent remains to be proven at trial; the trustee adequately alleges BOL's insolvency in the complaint, and at this juncture, that is enough.

AGS asserts that it is not an "insider".  Where the debtor is a corporation, an "insider" includes a "person" in control of the debtor under §101(31B).  The term "person" includes "Individual, partnership and corporation" under §101(41).  A bank's power to shut down a borrower because the borrower cannot find alternate sources of financing is financial control, but not the type of control needed to establish the bank as an insider.  The type of control intended under §101(41) is that of operational, or managerial control over the debtor. *In re Octagon Roofing*, 124 B.R. 522, 530 (Bankr. E. D. Ill. 1991).  The complaint sufficiently alleges that AGS, through Alan, attempted negotiations with BOL creditors, negotiated on BOL's behalf a loan with Star Bank (used to repay AGS) and participated in essential day to day operations of BOL.  Count VI states a claim as to AGS' insider status and will not be dismissed.

10

### *Count VII: Equitable Subordination*
### *(AGS, Alan and 02)*

AGS filed two secured claims, one in the amount of $986,061.01 for the 2011 Loan and one in the amount of $170,787.87 for the Star Loan it purchased post-petition. 02 has filed a claim in the amount of $149,466.80 for "balances due Creditor under Various Leases". The claims bar date has passed and Alan has not filed a claim. Since there is no claim of Alan's to equitably subordinate, Count VII shall be dismissed as to him.

Equitable subordination under §510(c) allows a creditor's claim to be "reprioritized" if the claimant is guilty of misconduct that injures other creditors or confers an unjust advantage on the claimant. *In re Kreisler*, 546 F.3d 863, 866 (7th Cir. 2008). The objective is not to punish the claimant but to remediate the effect the misconduct had on other creditors. *Id.* Section 510(c) contains no guidance as to the type of conduct needed to equitably subordinate a claim, but at a minimum, it must be not only "inequitable" but "seriously so". *In re Sentinel Management Group, Inc.*, 809 F.3d 958, 965 (7th Cir. 2016) (suggesting that the conduct be "tantamount to fraud", "willful" and "egregious"). Case law has established that three factors be present: (1) the claimant must have engaged in some type of inequitable conduct, (2) the misconduct must have resulted in injury to the creditors, or conferred an unfair advantage on the claimant and (3) subordination of the claim must not be inconsistent with the provisions of the bankruptcy code. *Kreisler*, at 866. The type of conduct that has been determined to be inequitable for §510(c) purposes includes breach of fiduciary duties, undercapitalization and the claimant's use of the debtor as its alter ego. *In re Lifschultz Fast Freight*, 132 F.3d 339, 344-345 (7th Cir. 1997). These types of conduct typically involve insiders of the debtor who are subjected to a higher level of scrutiny. *Id.*

AGS argues, and 02 has joined in, that the complaint fails to allege facts that show that they engaged in inequitable conduct. The Trustee's plausible allegations simply are that AGS, as well as Alan and Terri, individually and as persons in control of AGS, caused BOL to engage in a leveraged buyout of BOL stock and caused BOL to be undercapitalized, failed to document many transactions between AGS and BOL, caused

11

02 to be formed and loaned it – not AGS - money to purchase equipment even though a recognized "fatal flaw" in BOL's business plan was that it leased equipment, looted BOL by transferring all its assets and customers worth $1.5 million to 02 for consideration of $25,000, formed 02 to carry on the same business as BOL's, and failed to document the transfer with bills of sale or purchase agreements.  The complaint alleges that 02, for consideration of $25,000, used BOL's employees, office space, patient numbers and inventory and equipment to carry on essentially the same business in which BOL had been engaged. The complaint meets the plausible standard to allege inequitable conduct.

AGS also points out that its claim from the Star Loan cannot be subordinated because the Trustee has not alleged that Star Bank engaged in inequitable conduct. The focus under §510(c) is less about punishing the specific creditor and more about remediating the unfairness to other creditors that results from *that creditor's claim position.*  AGS has cited no case that stands for the proposition that it is the status of the original claimant that controls as to whether the transferee claimant can be the subject of a §510(c) challenge.  Certainly, the original creditor and the entity to whom that claim is transferred can occupy different statuses and claims positions within the bankruptcy case. Count VII states a claim against AGS and 02 for equitable subordination of their claims.

### *Count VIII: Breach of Fiduciary Duty*
### *(Alan and Terri)*

Shareholders, officers and directors in a closely held corporation owe the corporation a duty to deal fairly, honestly, and openly and must not be distracted from the performance of official duties by personal interests.  *Rapkin Group, Inc. v. Cardinal Ventures,* Inc. 29 N.E. 3d 752, 757 (Ind. Ct. App. 2015).  A breach of fiduciary duty occurs where (1) a fiduciary relationship exists; (2) that duty was breached and (3) the beneficiary was harmed by the breach.  *Id.*  It is a breach of fiduciary duty to cause a corporation to enter into unfair transactions that inure to the personal advantage of the fiduciaries.  *G & N Aircraft, Inc. v. Boehm*, 743 N.E.2d 227, 238 (Ind. 2001).

Alan maintains that he was not a shareholder, officer or director and therefore did not owe a duty to BOL. The complaint alleges that Alan became BOL's CEO soon after the stock was purchased from the Fish family. Whether Alan is or is not an officer is not for determination here; the complaint states that Alan was an officer and that allegation for purposes of the motion to dismiss is taken as true. Terri argues that she had no personal involvement in any of the transactions that allegedly would give rise to a breach of her fiduciary duty. There is no doubt that Terri was the majority shareholder of BOL at all times pertinent to the Trustee's complaint and that she, along with Alan, controlled AGS. A fair inference to be made is that she was aware of AGS' business dealings with BOL. Terri's failure to act and prevent harm to BOL can be a breach of her fiduciary duty. The Trustee has stated a claim under Count VIII.

### *Count IX: Demand for Accounting and Turnover*
### *(02 and AGS)*

Lastly, the Trustee demands that 02 provide to her an accounting of 02's use of BOL's equipment and turnover the fair market value of the equipment and supplies used by 02, as per the letter of intent. The motion to dismiss this count as to the demand for an accounting may be moot as counsel for 02 reported in the February 9th hearing that 02 had provided or was in the process of providing such an accounting.

In Count IX, Trustee alleges that 02 and AGS are in control or possession of BOL's receivables, equipment, inventory and other property that otherwise would be property of BOL's bankruptcy estate and has made a demand for turnover of all such property. Section 542 allows a trustee to demand delivery of estate property that is in the possession or control of an entity other than a custodian. Count IX sufficiently states a claim against 02 and AGS.

Based on the foregoing, the motion to dismiss is GRANTED as to the allegations against Alan in Count VII (equitable subordination); it is DENIED in all other respects.

**#   #   #**